UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CHARLES D. NELSON,<br><br>    Plaintiff,<br><br>v.<br><br>F/N/U BROWN, et al.,<br><br>    Defendants. | Case No. 3:17-cv-00792<br><br>Judge Eli J. Richardson<br>Magistrate Judge Alistair E. Newbern |

To:    The Honorable Eli J. Richardson, District Judge

# **REPORT AND RECOMMENDATION**

This pro se civil rights action brought under 42 U.S.C. § 1983 arises out of Plaintiff Charles D. Nelson's pretrial detention in the Wilson County Jail in Lebanon, Tennessee. (Doc. No. 1.) Nelson alleges that Defendants Officer Nathaniel Morse and Lieutenant Craig Brown used excessive force against him in violation of his constitutional rights when they handcuffed him and shocked him with a taser in March 2017. (*Id.*) Morse and Brown have filed a renewed motion for summary judgment, supported by a memorandum of law, a statement of undisputed material facts, and several exhibits. (Doc. Nos. 44–46.) Nelson has responded in opposition only to the defendants' statement of undisputed material facts. (Doc. No. 49.) Upon consideration of the record evidence as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the Court grant the defendants' motion and enter summary judgment in their favor.

**I.    Background**

    **A.    Factual Background**[1]

The events underlying Nelson's claims took place inside the Wilson County Jail on March 20, 2017. (Doc. Nos. 1, 1-1.) The incident began when Nelson got out of his bunk, put on socks, and came out of his cell for recreation time. (Doc. No. 1-1.) Officer Morse was performing a security check in I-Pod and noticed that Nelson's pants were tucked into his socks. (Doc. No. 44-1.) The Wilson County Jail does not allow detained or incarcerated persons to wear their pants tucked into their socks because tucked-in pants are often used as a gang sign. (*Id.*) Morse states that he talked to Nelson about his socks and that Nelson "pulled his pant legs from his socks half way[,]" then walked to a table and sat down. (*Id.* at PageID# 172–73, ¶ 7.) Nelson states that he walked to the table because he was trying to point out other inmates whose pants legs were also tucked in. (Doc. No. 49.)

Morse ordered Nelson to return to his cell, or "lock down." (Doc. Nos. 1-1, 44-1, 49.) Nelson asked to speak to Lieutenant Brown (Doc. Nos. 1-1, 44-1); Morse refused and instead called for Officer Micah Estes to meet him in I-Pod (Doc. No. 44-1). Estes arrived and asked Nelson what was going on. (Doc. Nos. 1-1, 44-1, 49.) Nelson tried to explain and again pointed out a few other inmates whose pants were tucked into their socks. (Doc. Nos. 1-1, 49.) Estes ordered Nelson to return to his cell. (Doc. Nos. 1-1, 44-1, 46.) Nelson got up from the table, walked to the stairs, and told the officers to take him to L-Pod, which is a segregation unit. (*Id.*)

---

[1]    The facts in this section are drawn from Nelson's verified complaint (Doc. Nos. 1, 1-1), Morse and Brown's summary judgment exhibits (Doc. Nos. 44-1–44-6), and Morse and Brown's statement of undisputed material facts (Doc. No. 46). *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (holding that a verified complaint carries the same evidentiary weight as an affidavit for purposes of summary judgment). The Court cites Nelson's unsworn response to Morse and Brown's statement of undisputed material facts (Doc. No. 49) only where Nelson appears to agree that a fact is undisputed.

The parties give differing accounts of what happened next. Morse states that Estes ordered Nelson to put his hands on the wall and that Nelson did so, but that Nelson "began to fight and resist" when Morse cuffed Nelson's left hand. (Doc. No. 44-1, PageID# 173, ¶ 15.) Morse states that he and Estes then "placed Mr. Nelson on the ground . . . where he continued to resist." (*Id.*) According to Nelson, Morse and Estes "started using excessive force [and] saying [he] was resisting[,] [b]ut [he] wasn't . . . ." (Doc. No. 1-1, PageID# 7.) Nelson states that "the way that [Morse and Estes] [were] using force was hurting [his] arm" because he has prior injuries on that side of his body, but that "instead of them list[e]ning they [were] mak[]ing it seem like [Nelson] was resisting." (*Id.*)

Lieutenant Brown and other officers arrived after Nelson was already on the ground. (Doc. Nos. 1-1, 44-1, 44-2.) Nelson states that he was on the ground with his hands behind his back when Brown shocked him with a taser and "there was no reason at all for" Brown to do so. (Doc. No. 1-1, PageID# 8.) Morse and Brown state that Nelson was actively resisting Estes and Morse's efforts to handcuff him, including by refusing commands to give them his hands, when Brown delivered a shock to Nelson's lower back. (Doc. Nos. 44-1, 44-2.) Brown states that Nelson then "attempted to jerk away from the officers, but Officer Morse was able to get [him] handcuffed." (Doc. No. 44-2, PageID# 176, ¶ 12.)

Morse and Brown filed two videos that capture some of these events, although neither video includes audio.² (Doc. No. 44-5.) The first video was taken by a camera located behind the

---

² The Court may consider video evidence at the summary judgment stage. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that, based on video evidence, a police officer did not use excessive force in ramming a fleeing suspect's car and reversing lower courts' denial of summary judgment); *see also Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (considering video evidence in ruling on defendant's motion for summary judgment on detainee plaintiff's excessive force claim).

stairs on one end of the first floor of a large, two-story room in the Wilson County Jail. It shows two officers, presumably Morse and Estes, standing near a table where a few men in bright orange uniforms are sitting. Morse and Estes are dressed in dark shirts and khaki-colored pants. One man in an orange uniform, presumably Nelson, stands and walks toward the camera and Morse and Estes follow him. When they reach the foot of the stairs, all three men disappear from the camera's view. About 45 seconds later, the video shows either Morse's or Estes's leg—identifiable by the khaki pants—moving erratically on the ground near the foot of the stairs as though a struggle is taking place. Twenty seconds after that, a door to the left of the camera opens and eight officers enter the scene and move toward the foot of the stairs. Three officers remain in the camera's view, watching what is happening at the foot of the stairs. The other five officers who entered, presumably including Brown, disappear from the camera's view. About 30 seconds after the officers enter, Nelson comes back into view standing between two officers with his hands cuffed behind him. One officer holds each of Nelson's arms, and Nelson and all of the officers move toward the door.

The second video was taken by a camera located on the second floor and at the opposite end of the room. It shows the area at the foot of the stairs from a distance. In this video, Nelson rises from the table and walks away from the camera and toward the stairs, followed by Morse and Estes. Nelson climbs halfway up the stairs, then stops. Morse and Estes stand near him and the three men remain still for about ten seconds. Then Nelson walks back down the stairs and stops near the base of the stairs. Morse and Estes again follow him. There are about eleven other men in orange uniforms in the room, and most appear to be watching Nelson, Morse, and Estes. Nelson moves toward the wall at the base of the stairs and disappears from the camera's view behind what appears to be a guard station. Morse and Estes stand behind him with their arms and hands not in

view. About fifteen seconds later, Morse, Estes, and Nelson tumble to the ground in front of the stairs. The footage is blurry, but it is clear that the three men are struggling. It appears that Nelson tries to stand up and is pulled back down. Morse and Estes appear to be on top of Nelson less than 30 seconds later when the first of the eight arriving officers reaches the foot of the stairs. Four officers then surround Morse, Estes, and Nelson, but the camera is too far away, the footage too blurry, and the view too obstructed to tell what is happening inside the cluster of officers. Eventually, the officers on the ground stand and move away from the camera and toward the door with Nelson.

After this incident, the officers took Nelson to a nurse for a medical evaluation. (Doc. Nos. 44-1, 44-2, 46.) The nurse was "[u]nable to see any marks on [Nelson's] back" (Doc. No. 44-3, PageID# 177) and signed a "post use of force medical evaluation" form indicating that Nelson did not have any "[a]brasions[,]" "[c]uts[,]" or "[b]ruising" (Doc. No. 44-4, PageID# 178). The nurse's notes reflect that Nelson was offered a breathing treatment "as scheduled." (Doc. No. 44-3, PageID# 177.) Morse and Brown submitted a third video of Nelson taken after the medical evaluation. (Doc. No. 44-6.) The footage appears to be from a body camera and includes audio. Nelson is seated with his hands cuffed in front of his body, holding a plastic breathing tube. Nelson is arguing with an officer who is telling him to put his breathing treatment down. Two officers grasp Nelson's arms, pull him to his feet, and, with other officers, escort Nelson through a doorway and into a hallway. Nelson yells "stop jerking on me man!" An officer tells Nelson to walk. Nelson continues to voice complaints as three officers walk him down a hall, through a few doorways, and into an empty cell.

**B.     Procedural History**

Nelson filed a verified complaint on May 3, 2017, naming Brown and Morse as defendants and alleging constitutional violations under 42 U.S.C. § 1983. (Doc. Nos. 1, 1-1.) The Court

granted Nelson's application to proceed *in forma pauperis* and reviewed the complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, finding that Nelson had stated colorable claims for excessive use of force against both defendants under the Fourteenth Amendment, which governs excessive force claims by pretrial detainees. (Doc. Nos. 5, 6.)

Morse and Brown filed their first motion for summary judgment on July 23, 2018, supported by a memorandum of law, a statement of undisputed material facts, and several declarations and exhibits. (Doc. Nos. 25–28.) Their filed exhibits included two discs purportedly containing video footage of the events described above, which Morse and Brown provided to the Court and to Nelson. (Doc. Nos. 29–30.) Nelson submitted a letter to the Court explaining that he could not view the video footage, and was therefore unable to respond to the defendants' motion for summary judgment, because "one of the [d]isk[s] was [b]roke[n] [a]nd the other won[']t play in the com[]puter" at the Northeast Correctional Complex where Nelson is now incarcerated. (Doc. No. 42, PageID# 160.) In light of this difficulty and the Court's own technical difficulty viewing the video footage on the provided discs, the Court administratively terminated the defendants' motion for summary judgment without prejudice to refiling with properly formatted copies of the supporting video and audio evidence. (Doc. No. 42.)

Morse and Brown filed a renewed motion for summary judgment on April 1, 2019, accompanied by two discs with accessible video files, a memorandum of law, a statement of undisputed material facts, their own declarations, and other exhibits. (Doc. Nos. 44–46.) They argue that they are entitled to summary judgment under the doctrine of qualified immunity because Nelson has not shown that they violated his clearly established constitutional rights. (Doc. No. 45.) Nelson filed a response to the defendants' statement of undisputed material facts, but his responses are not sworn and do not cite any specific record evidence. (Doc. No. 49.) Nelson has not

responded to Morse and Brown's legal arguments and has not submitted any additional evidence to oppose what Morse and Brown have filed.[3]

## II. Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its

---

[3] Nelson filed two letters alleging that Brown and Morse destroyed or removed video footage from two additional cameras inside the Wilson County Jail (Doc. Nos. 50, 51), which the Court construed as a motion seeking discovery sanctions for spoliation of evidence (Doc. No. 52). Brown and Morse responded in opposition, explaining that the two cameras Nelson mentioned "were used solely for observational purposes" and "were not recording at the time of the incident . . . ." (Doc. No. 54, PageID# 221.) The cameras therefore "did not generate any video footage that could have been preserved and/or provided to" Nelson. (*Id.*) The Court has addressed Nelson's motion for spoliation sanctions, along with other motions, in a separate order.

opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B); *see also* M.D. Tenn. R. 56.01(c) (response to statement of facts) (requiring any party opposing summary judgment, including those proceeding pro se, to include a "specific citation to the record" in support of "[e]ach disputed fact"). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

**III.     Analysis**

"Section 1983 provides a civil enforcement mechanism for all inmates [and pretrial detainees] who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (second alteration in original) (quoting 42 U.S.C. § 1983). To prevail on a claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010)). Here, Nelson

8

alleges that Morse and Brown used excessive force against him, depriving him of his right to due process under the Fourteenth Amendment. (Doc. Nos. 1, 1-1.) Morse and Brown have raised qualified immunity as an affirmative defense to Nelson's claims. (Doc. No. 45.)

"The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Quigley v. Thai*, 707 F.3d 675, 680 (6th Cir. 2013). "[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Where, as here, defendants invoke qualified immunity, "the plaintiff bears the burden to show that qualified immunity is inappropriate." *Quigley*, 707 F.3d at 681.

To demonstrate that Morse and Brown used excessive force against him in violation of his Fourteenth Amendment rights, Nelson "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). In determining whether Nelson has met that standard, the Court must consider "the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* The Court "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'polices and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (alterations in original) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). The Supreme Court has set forth

9

several factors "to illustrate the types of objective circumstances potentially relevant to a determination of excessive force" in this context, including:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Even if Nelson can show a genuine question of material fact as to whether Morse and Brown violated his constitutional rights, they would still be entitled to qualified immunity if those rights were not clearly established at the time of violation. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In other words, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "The precedent clearly establishing a right can be in the form of a case of 'controlling authority or a robust consensus of cases of persuasive authority.'" *Latits v. Phillips*, 878 F.3d 541, 552 (6th Cir. 2017) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014)).

### A. Officer Morse

Officer Morse argues that he is entitled to qualified immunity because the record evidence shows that he used objectively reasonable force when handcuffing Nelson, who "was continuously disobeying orders and actively resisting the officers' attempts to secure him." (Doc. No. 45, PageID# 186.) Nelson has not submitted any evidence in response to Morse's summary judgment arguments and exhibits. Nelson's only sworn testimony in the record comes from his verified complaint. (Doc. Nos. 1, 1-1.) Applying the relevant standards to this limited record, there is no genuine dispute of material fact as to whether Morse used excessive force in violation of Nelson's

constitutional rights by "hurting [Nelson's] arm" while trying to handcuff him. (Doc. No. 1-1, PageID# 7.)

Considering the relevant factors, Morse has satisfied his initial burden of demonstrating that there is no genuine dispute of material fact that the amount of force he used to handcuff Morse was objectively reasonable. First, the record evidence shows that Morse attempted to avoid using force by twice ordering Nelson to return to his cell, but Nelson refused to follow those orders. Morse states in his affidavit that he "asked Mr. Nelson to 'lock down' which means return to his cell" and that Nelson told him "that he was not going to lock down and that he wanted to speak to Lt. Craig Brown." (Doc. No. 44-1, PageID# 173, ¶¶ 8, 9.) Morse "told [Nelson] that [Morse] would talk to Lt. Brown once [Nelson] locked down" but "Nelson refused once more . . . ." (*Id.* at PageID# 173, ¶¶ 9, 10.) Morse states that Estes then "asked Mr. Nelson to lock down" and that, after getting up from the table and walking halfway up the stairs, Nelson "replied, 'No take me to L-pod then!'" (*Id.* at PageID# 173, ¶¶ 10, 11.)

Second, Morse has introduced sworn evidence to show that handcuffing Nelson was necessary to maintain institutional security. Morse states that "L-pod is a segregation unit commonly used for inmates who refuse orders" and that, "[i]n order to transport Mr. Nelson to L-Pod[,] it was imperative that he be handcuffed for safety reasons." (*Id.* at PageID# 173, ¶¶ 12, 13.) Third, Morse testified that he began handcuffing Nelson to transport him to L-Pod and that, after he handcuffed Nelson's left wrist, Nelson started fighting and actively resisting. (Doc. No. 44-1.) Morse states that he and Estes then "placed Mr. Nelson on the ground for officer and inmate safety" and that Nelson "continued to resist" their efforts to handcuff him. (Doc. No. 44-1, PageID# 173, ¶ 15.) The video evidence in the record does not show whether Nelson was resisting Morse's efforts to handcuff him while he was standing against the wall. (Doc. No. 44-5.) However, it does

corroborate Morse's testimony that Nelson resisted once he was on the ground, showing that Nelson physically struggled with Morse and Estes and tried to stand up. (Doc. No. 44-5.) *See Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (explaining that "[a]ctive resistance includes 'physically struggling with, threatening, or disobeying officers'" as well as "refusing to move your hands for the [officers] to handcuff you, at least if that inaction is coupled with other acts of defiance" (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012))). Finally, the medical evidence in the record shows that Nelson did not have any observable injuries immediately following Morse's use of force, indicating that the level of force used was not extreme. (Doc. Nos. 44-3, 44-4.)

Nelson has not pointed to any specific record evidence that contradicts Morse's version of events. He has not introduced any evidence to suggest that he was injured by Morse's use of force or that his behavior did not pose a security risk. Nelson's verified complaint corroborates Morse's testimony that Nelson refused to lock down. Specifically, Nelson alleges that Morse told him to "go lock down" and that he responded by asking "for what[,]" "pointing people out and saying [he was] not the only one who[se] pant[ ] legs w[ere] like that[,]" and asking for a lieutenant. (Doc. No. 1-1, PageID# 7.) Nelson states that, after Estes also told him to "go lock[ ] down[,]" Nelson "got up from the table[,] walked towards the steps[,]" and told the officers to "take [him] to L-Pod . . . ." (*Id.*) Because Nelson's verified complaint admits that he refused to lock down, his unsworn assertion in response to Morse and Brown's statement of undisputed material facts that he "didn't refuse" Morse's order to lock down is insufficient to create a genuine dispute for purposes of summary judgment. (Doc. No. 49, PageID# 202, ¶ 6.)

Broadly construed, Nelson's verified complaint states that he did not resist being handcuffed while standing against the wall. (Doc. No. 1-1.) This sworn allegation conflicts with

12

Morse's testimony, but it is not sufficient, standing alone, to withstand summary judgment. Even construed in the light most favorable to Nelson, this is the kind of "merely colorable" and "not significantly probative" evidence that, without more, may not defeat a well-supported motion for summary judgment. *Anderson*, 477 U.S. at 249; *see also Blizzard*, 698 F.3d at 282. Further, Nelson's conclusory statement does not create a genuine question of fact in light of the video evidence showing a struggle taking place as the officers attempted to apply the handcuffs.

On this record, construed in the light most favorable to Nelson, no reasonable jury could find that Morse's use of force was objectively unreasonable in violation of Nelson's constitutional rights. Morse is therefore entitled to qualified immunity and summary judgment.

### B. Lieutenant Brown

Lieutenant Brown argues that he is entitled to qualified immunity because his use of a taser was objectively reasonable under the circumstances. It is undisputed that Nelson was face-down on the ground when Brown shocked him with a taser. (Doc. Nos. 1-1, 44-2.) Brown has provided sworn testimony that "Nelson was actively resisting the officers and refused to comply with their commands to give them his hands so he could be handcuffed" when Brown "activated [his] [t]aser and delivered a drive stun to Mr. Nelson's lower back." (Doc. No. 44-2, PageID# 176, ¶¶ 9, 11.) Morse has testified that only Nelson's left wrist was handcuffed and that Nelson was still resisting at the time he was tasered. (Doc. No. 44-1.)

Again, Nelson has not introduced any evidence in response to the defendant's motion for summary judgment to contradict this testimony. Nelson's verified complaint does not directly contradict the officers' testimony; Nelson states only that "my hands was all ready behind my back and I was on the ground" when Brown used the taser. (Doc. No. 1-1, PageID# 7.) The video footage shows Nelson physically struggling with Morse and Estes on the ground before Brown and the other officers arrived. It does not show Nelson at the moment he was tasered.

Construing the record evidence as a whole in the light most favorable to Nelson, there is no genuine dispute of fact, for purposes of summary judgment, that Nelson was resisting Morse and Estes and his hands were not yet cuffed together when Brown tasered him in the back. Nelson's unsworn statement, made in response to Morse and Brown's statement of undisputed material facts, that his "hands w[ere] behind [his] back with cuffs on when Lt. Brown came thr[ough] the door with his taser all ready [sic] drawn[,]" (Doc. No. 49, PageID# 204) is insufficient, without supporting record evidence, to create a genuine dispute about whether Nelson's hands were cuffed together when Brown shocked him. *See Blizzard*, 698 F.3d at 282; Fed. R. Civ. P. 56(c)(1)(A)–(B). Sixth Circuit precedent establishes that tasering a detainee who "'actively resists'" and "'refuses to be handcuffed'" is not objectively unreasonable. *Kent v. Oakland Cty.*, 810 F.3d 384, 396 (6th Cir. 2016) (quoting *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012)); *see also Rudlaff*, 791 F.3d at 641 ("Our cases firmly establish that it is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest.").[4] On this record, therefore, Brown is entitled to qualified immunity and summary judgment as a matter of law.

## IV.  Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that the Court GRANT Defendants Morse and Brown's motion for summary judgment (Doc. No. 44) and enter judgment in their favor.

---

[4] Both *Kent* and *Rudlaff* addressed excessive force claims under the Fourth Amendment; however, the Sixth Circuit has recognized that, under *Kingsley*, "the same objective standard" used to resolve excessive force claims brought under the Fourth Amendment also applies to excessive force claims brought under the Fourteenth Amendment. *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015).

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 9th day of January, 2020.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge